UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

BRENDA J. JONES,            )
                           )
          Plaintiff        )
                           )
          v.               )   Case No. 2:04 cv 536
                           )
JO ANNE B. BARNHART,        )
Commissioner of Social Security,)
                           )
          Defendant        )

<u>OPINION AND ORDER</u>

This matter is before the court on the Motion for Summary Judgment filed by the plaintiff, Brenda J. Jones, on June 2, 2005, and the Motion for Remand filed by Jones on July 27, 2005. For the reasons set forth below, both motions are **GRANTED**.

<u>Background</u>

The plaintiff, Brenda Jones, initially applied for Disability Insurance Benefits on November 13, 2000, alleging a disability onset date of August 15, 1999. (Tr. 50)  The claim was denied initially on February 21, 2001 and upon reconsideration on July 24, 2001. (Tr. 31-32) Jones requested a hearing before an Administrative Law Judge ("ALJ") on September 12, 2001, and a hearing was held before ALJ Bryan Bernstein on August 13, 2002. (Tr. 41, 411) Subsequent to the hearing, the ALJ denied Jones' application by written decision dated December 5, 2002. (Tr. 16-24)  Following a denial of her request for review by the Appeals Council on November 19, 2004, Jones filed a complaint in this court on January 13, 2005. (Tr. 6)

Jones was born on July 9, 1957, and was 42 years old at the time of the ALJ hearing. (Tr. 50) She is 5' 3" tall and weighs approximately 290[1] pounds. (Tr. 417) She has three adult children with her husband, Donald Jones, to whom she has been married for 31 years. (Tr. 416) She stopped attending high school in the 11th grade, but she obtained her GED in 1985. (Tr. 417) Between 1987 and April 1999, Jones primarily worked in a series of nursing assistant jobs at hospitals, nursing homes, and other care facilities. (Tr. 60, 77) All of these jobs generally involved transferring, toileting, and bathing patients, which required Jones to lift between 100-150 pounds frequently, walk one to four hours, write or sit for one-half hour, and stoop, crouch, and handle objects between one and three hours each in a regular eight hour shift. (Tr. 60, 78-80, 81, 83) Jones also worked for two months as a warehouse laborer in 1993, and she received a 6% permanent partial impairment when a semi trailer crushed her left ankle, significantly injuring soft tissue. (Tr 77, 290, 292-97) She worked for three months in 1999 as a casino security guard before her condition forced her to quit and then for three weeks as an inventory scanner at Walgreens. At Walgreens, her job required her to lift 30 to 50 pound totes onto a table, scan the items in the tote, box them, and place the box on a conveyor belt. (Tr. 421) She stopped this job when her knee and shoulder became irritated. (Tr. 419-21)

---

[1] This weight, which is taken from the ALJ hearing and is the most recent statement of Jones' weight, may be a typographical error, as all medical records show that Jones weighs between 199 and 209 pounds.

Orthopedist Dr. Bruce Thoma of the Valparaiso Orthopedic Clinic began treating Jones at least as early as 1993 when her left ankle was crushed at work. (Tr. 258-98) On December 1, 1993, Dr. Thoma noted that six months post-injury, Jones continued to have pain, swelling, and tingling in her left hip with one or two hours of walking or standing. (Tr. 294) On January 6, 1994, Jones returned to Dr. Thoma complaining of swelling around her left tibia and fibula. (Tr. 293) On February 23, 1994, Jones reported no change in pain, tingling, weakness, and loss of endurance in her left foot and ankle, and Dr. Thoma concluded that she had a 6% permanent impairment and could expect no further medical improvement.(Tr. 292) Throughout this period, Dr. Thoma prescribed physical therapy, support hose, and Tylenol to treat Jones' symptoms. He also released her from care with a work restriction of six hour shifts or modified duty. (Tr. 289) On November 25, 1994, Dr. Thoma  concluded that Jones had a 15% permanent impairment of her left foot. (Tr. 290)

On May 21, 1997, Jones went to the emergency room of Porter Memorial Hospital complaining of discomfort in her lower spine and tingling in her left leg and foot from lifting a patient at work. (Tr. 132-33) Dr. D. Pursel diagnosed Jones with lumbosacral strain and a sprained left ankle. (Tr. 134-35)

On October 19, 1998, Jones began seeing family practitioner Dr. Kimberley Perry with complaints of back, bilateral knee, and finger pain that had worsened over the last year and increased in cool weather. (Tr. 348, Tr. 431) Upon examination, Dr. Perry

3

found that Jones had "some obvious midthoracic scoliosis to the right" but that her back, knees, and hands otherwise seemed normal. (Tr. 348) On June 16, 1999, Jones returned to Perry complaining of right shoulder pain radiating into her neck and intermittent right arm and hand numbness, which increased with movement and walking. (Tr. 342) Dr. Perry's examination of Jones did not reveal any abnormalities, but x-rays of Jones' right shoulder showed "straightening of cervical spine, most likely due to muscle spasm." (Tr. 342-43) Dr. Perry prescribed anti-inflammatory Daypro for Jones' symptoms and physical therapy for cervical strain. (Tr. 341) However, Jones' stomach could not tolerate the Daypro. (Tr. 339)

Jones attended physical therapy from July 7-21, 1999. Upon initial evaluation, therapist Sarah Oreseco noted that Jones had "moderate muscle guarding" on her right upper body and that Jones held her head forward and had rounded shoulders. (Tr. 153) The dates associated with therapy progress notes are omitted from the record, but Jones' final discharge note on July 21, 1999 states that she still had some tenderness in the front of her shoulder and "good" rehabilitation potential. (Tr. 144)

On August 7, 1999, Jones returned to the Porter Memorial Emergency Room complaining of right-sided abdominal pain with bloating. (Tr. 160) When Jones saw Dr. Perry five days later, Dr. Perry noted Jones' history of hiatal hernia/GERD (gastroesopha-geal reflux disease). (Tr. 340)

4

On October 6, 1999, Jones returned to Dr. Perry with com-
plaints of persistent right shoulder pain that had gotten worse
since her initial treatment in 1998.  She further described the
pain as worsening when she extended her right arm. (Tr. 339)
After finding that Jones was point-tender at the proximal inser-
tion of the bicipital tendon, Dr. Perry diagnosed Jones with
probable bicipital tendinitis, gave her a shot of lidocaine, and
prescribed Celebrex. (Tr. 339) Although Dr. Perry also ordered a
steroid injection, Jones had an allergic reaction to the injec-
tion and did not want to repeat the procedure. (Tr. 336)

On January 4, 2000, Jones went to the Porter Memorial
emergency room after falling on her right side and striking her
right elbow, shoulder, and hip on concrete. (Tr. 174) Emergency
room physician Robert Ealy noted that Jones no longer was taking
Celebrex because she had run out of the prescription. (Tr. 177)
Dr. Ealy also found that Jones had a decreased range of motion in
her right arm and shoulder. (Tr. 177) When Jones reported her
fall to Dr. Perry on January 12, 2000, Jones told Dr. Perry that
the anti-inflammatory prescriptions were not helping and that she
was now having difficulty putting on clothing and doing her hair.
(Tr. 336)  Dr. Perry also noted that the physical therapy Jones
completed in July 1999 did not improve her symptoms. (Tr. 336) A
January 17, 2000 MRI ordered by Dr. Perry was normal except for
"mild intermediate signal in anterior distal supraspinatus ten-
don, a finding which can be seen in tendinopathy." (Tr. 333) Dr.
Perry referred Jones back to the Valparaiso Orthopedic Clinic.

On February 3, 2000, Dr. Michael Leland, who worked with Dr. Thoma at the Orthopedic Clinic, evaluated Jones. He noted that Jones had "pain increased with cross chest shoulder flexion" upon examination, but stated that "[i]t is unusual to have pain of this nature associated with shrugging the shoulders which would itself suggest perhaps a muscular or cervical etiology of her pain." He gave Jones a second steroid injection and prescribed physical therapy. (Tr. 198)

Thus, on April 19, 2000, Jones began a second round of physical therapy, this time for bicipital tendinitis. (Tr. 194) During her evaluation, Jones told Therapist Mike Wendahl that her primary difficulties were associated with any weight bearing or rotation of arm, and that while steroid injections caused her moderate relief, she had ongoing reaggravations of the area. (Tr. 194)  Wendahl observed that "[i]n a static sit position, Brenda does exhibit tendencies of a noticeable increase in anterior chest wall tightness which is noted by an increased right pro-tracted position, slight depression of the right shoulder as compared to the left."  He also noted that Jones' right sternoclavicular joint was more prominent and less mobile than her left, with point tenderness along the bicipital tendon, coracoid process, and associated muscles. (Tr. 194) However, after two weeks of therapy, Wendhal told Dr. Leland that Jones had not achieved any significant changes in reduction of pain. (Tr. 189)

On June 22, 2000, Dr. Leland performed a right shoulder arthroscopy and subacromial decompression on Jones' right shoulder in which he excised an extra bone in her shoulder, to assist her impingement syndrome. (Tr. 204)  On June 29, 2000, Jones reported to Dr. Leland that her shoulder did not bother her at all, but by October 23, 2000, Dr. Perry referred Jones back to Dr. Leland because Jones again was experiencing persistent shoulder pain. (Tr. 277, 328)  Dr. Perry further noted that Jones was unable to take prescription anti-inflammatories because of her dyspepsia. (Tr. 328)

On October 29, 2000, Jones completed an Adult Disability Report in conjunction with her application for disability benefits. (Tr. 58-67) She described her condition as a foot injury, constant right shoulder and knee pain, neck spasms, and a hiatal hernia which limited her to standing or sitting six hours and which gave her pain lifting objects. (Tr. 59) In a Pain Report dated December 2000, Jones elaborated that her right shoulder pain occurred three or four times a day for one or two hours and that it prevented her from vacuuming, pushing, or lifting anything in excess of 15 or 20 pounds. (Tr. 91) Her shoulder also caused difficulty putting on clothes, adjusting herself in the car, writing, and wearing a bra. (Tr. 91) Jones described her neck pain as occurring once a month for up to two or three days and preventing her from doing all activities.  She further stated that driving, stress, standing, sitting, writing, and occasionally walking caused the pain to get worse. (Tr. 93) Finally,

7

Jones said that her right knee pain occurred three or four times a day for 30-40 minutes, increased in cold weather, and grew worse with climbing, stooping, kneeling, and sometimes driving. (Tr. 95) She described her left knee ankle pain as lasting one to two hours approximately three to four times a month, and she stated that her ankle bothered her with "a lot" of walking or standing and sometimes stopped her from doing dishes and standing to cook. (Tr. 97)

In an Activities of Daily Living report dated December 18, 2000, Jones stated that she cooked a meal every other day, did laundry, sewed, drove, did some lawn work, and read. (Tr. 85) However, Jones described difficulty with her right knee and shoulder when driving and said that her husband drove whenever possible, except for when Jones drove her son to school four days a week.  She also stated that while she did laundry, her husband and son carried the laundry and helped her lift it.  Finally, she clarified that she performed light housekeeping but that her husband performed most housekeeping duties, pushed the grocery cart at the supermarket, and carried groceries from the store to the car and into the house. (Tr. 85-88)  Jones reported consistent activities and limitations in a second ADL report on March 4, 2001. (Tr. 104-07) She further stated that it was very difficult to rise from a seated position without pain or her knees locking and that walking around for an hour caused pain. (Tr. 107)

8

On January 25, 2001, Dr. Teofilo Bautista examined Jones for the Disability Determination Bureau ("DDB").  Jones told Dr. Bautista that she was not on any pain medication except for Tylenol at that time, that she could write for an hour, walk about five or six hours on concrete, sit for six hours, stand for two hours, and climb 10 steps.  (Tr. 223) According to Jones, she could lift and carry 10 pounds with her left hand, but she was not able to do repetitive hand work. (Tr. 223) Upon examination, Dr. Bautista found that Jones had a limited range of motion in her right shoulder, a normal gait, and that she could squat briefly and hop/jump very briefly. (Tr. 225) Jones exhibited muscle strength and tone of 4/5 on the right side and 5/5 on the left, with good grip strength and manipulative abilities.  Dr. Bautista concluded that Jones had impingement syndrome in her right shoulder, right knee pain due to bursitis/tendinitis, degenerative joint disease in the right knee, a history of a crushed left foot, and cervical strain or muscle spasm at the occipital area. (Tr. 225)

On May 2, 2001, Dr. Perry noted that Jones did not have any relief on a trial prescription of Vioxx and that other pain medication caused an increase in her dyspepsia, and so she prescribed Arthrotec.  She also found that Jones had crepitus and effuse warmth at both knees.  (Tr. 318) Thus, on  May 10, 2001, Dr. Perry sent Jones back to physical therapy for a third time. (Tr. 227-40, 320) Once again, the dates of the therapy sessions are omitted from the record, but the notes consistently report

that Jones had some discomfort or pain with standing, felt that
her knee was locking up or giving out during therapy activities,
and had increased pain with certain activities. (Tr. 230-31) On
May 25, 2001, Jones notified Dr. Perry that the Arthrotec, like
the Celebrex and Vioxx, also caused stomach problems and that the
physical therapy was not helping. Dr. Perry observed "obvious
swelling and joint effusion of the left knee more than on the
right," with crepitus, and point-tenderness at the medial lip of
the tibia, quadriceps tendon, and hamstring tendinous insertions
on both legs. (Tr. 316) At the close of therapy on June 13, 2001,
Therapist M. Thompson only rated Jones' rehabilitation potential
as "fair." (Tr. 227)

On June 25, 2001, Dr. M. Zeitoun evaluated Jones for the
DDB.  (Tr. 241-42) He observed that Jones had a slow gait due to
her obesity and that she had mild difficulty walking heel to toe
and tandemly, stooping, and squatting. (Tr. 241) Dr. Zeitoun
further found tenderness at Jones' right shoulder and both knees
with a decreased range of motion at the right shoulder. (Tr. 242)
On July 26, 2001, Dr. A. Lopez reviewed the evidence of Jones'
condition for the DDB and opined that Jones had a residual
functional capacity ("RFC") to lift 50 pounds occasionally, lift
25 pounds frequently, and stand, walk, or sit for about six hours
in an eight hour workday, with unlimited ability to push or pull.
(Tr. 246) Dr. Lopez further stated that Jones had occasional
problems climbing, stooping, kneeling, crouching, or crawling
with frequent difficulty balancing, and that she had constant

10

limitations fingering and feeling in both hands and reaching and with her left hand, and occasional limitations reaching and handling with the right. (Tr. 248)

On July 31, 2001, Dr. Thoma performed an arthroscopic debridement on Jones' left knee, and he corrected a horizontal tear from the articular cartilage.  He further diagnosed Jones with degenerative arthritis. (Tr. 271-76)

On August 28, 2001, Jones returned to Dr. Thoma complaining of left foot and shoulder pain, particularly with repetitive or persistent activity and elevation of the arm past 90 degrees. (Tr. 268) Her left arm tested positive for impingement, and a physical examination of the left-foot showed tenderness over the peroneal tendons.  (Tr. 268) He ordered an MRI for both areas, which showed mild tendinitis of the supraspinatus and AC joint arthritis in the shoulder, as well as mild tendinitis in the foot. (Tr. 266, 269) On September 11, 2001, Dr. Thoma gave Jones a third steroid shot into the left shoulder and referred her to physical therapy for both extremities. (Tr. 266-67)  Her final therapy note from September 26, 2001 states that Jones initially described her pain at 4/10 at rest and 7/10 with activities in the left shoulder and that these pain levels were "slightly improved" following therapy. The therapist recommended continued rehabilitation, which Dr. Thoma approved on September 27, 2001. (Tr. 253, 263)   After another month of physical therapy, Jones reported her shoulder pain at 1/10 at rest and 3/10 with activi-ties on October 26, 2001.  However, Jones still reported that her

11

pain intensified with performance of ADLs and lifting weighted objects. (Tr. 353)

On November 7, 2001, Jones went to the Porter Memorial emergency room after an anxiety attack. (Tr. 299) Dr. Ealy diagnosed an anxiety syndrome with a situational reaction and discharged her with prescriptions for Ambien and Ativan. (Tr. 299-304) Two days later, Jones told Dr. Perry that she had been experiencing increased nervousness, crying spells, and insomnia in the last few months due to tensions between her son and husband.  Dr. Perry diagnosed depression with an anxiety component and prescribed Zoloft. (Tr. 310)

On January 9, 2002, Dr. Thoma completed a Medical Assessment of Ability to Do Work-Related Activities for the DDB.  (Tr. 359-61)  According to Dr. Thoma, Jones could lift and/or carry a maximum of 10 pounds for up to one-third of an eight hour day and a maximum of five pounds for up to two-thirds of the day.  He opined that Jones could stand and walk for two hours total and for 30 minutes without interruption.  He based this assessment on Jones' bilateral knee osteoarthritis, bilateral shoulder chronic tendinitis, left ankle injury in 1996, her two arthroscopic surgeries, and her hiatal hernia with GERD.  (Tr. 359) He further stated that Jones could sit for only four hours total, or 30 minutes without interruption, because her knees stiffen and ache after 15 minutes and lock or catch when standing from a seated position, that Jones had difficulty pushing up from a chair, and that her arms needed support when sitting. (Tr.360) Dr. Thoma

described limitations in handling, feeling and pushing/pulling due to Jones' limited range of motion, strength, and endurance in her shoulders and said that she should not work around moving machinery or vibrations because she had difficulty climbing stairs with her knees and using railings with her arms. (Tr. 360) Although Dr. Thoma did not believe Jones needed periods of rest in a reclined position during an eight-hour period, he said that she could not write for more than 15 minutes at a time or for a total of 30 minutes due to numbness, cramping, and tingling in her hand. (Tr. 361) He concluded that sedentary work would be difficult for Jones because even non-repetitive work with rest periods caused pain, cramping, and decreased arm use and because Jones could not obtain relief through medication because of NSAID (non-steroidal anti-inflammatory drugs) side effects and GERD. (Tr. 361)

On May 14, 2002, Jones went to the Porter Memorial emergency room after spraining her right ankle at home. (Tr. 367-69) On June 17, 2002, she went to Dr. Thoma complaining of persistent swelling and stiffness in the ankle.  Dr. Thoma found continuing tenderness from the sprain.  He also reviewed recent right knee MRI results which showed a "tiny focus of potential avascular necrosis in the patellar area," as well as some degenerative signal in the meniscus. He recommended continued nonoperative care but suggested more arthroscopic surgery if her symptoms worsened or failed to improve. (Tr. 376) On July 19, 2002, Jones returned to Dr. Thoma because she had no improvement in her right

13

knee, which continued to give out periodically. Dr. Thoma found "definite crepitus" in the joint with minimally tender medial and lateral joint lines.  Because Jones continued "to have symptoms which are incompletely explained by the findings," Dr. Thoma scheduled Jones' third arthroscopic debridement and possible partial medial meniscectomy. (Tr. 383)

On July 30, 2002, Dr. Perry wrote to counsel for the plaintiff and summarized Jones' treatments to date. She stated that beyond Jones' orthopedic problems, her depression was "well controlled on Zoloft" and the GERD and hiatal hernia also were under "excellent control" with medication. (Tr. 385) Dr. Perry noted, however, that Jones' osteoarthritis was difficult to control because of the GERD and that they were trying a new drug, Bextra. (Tr. 386) She stated that Jones wanted to try going off Zoloft, which Dr. Perry did not recommend until after Jones' next surgery.

On August 6, 2002, Dr. Thoma performed the arthroscopic surgery on Jones' right knee. (Tr. 391-92)   On October 14, 2002, Jones reported that her ankle symptoms had not changed, and the results of a right ankle MRI showed a "significant effusion in the subtalar joint" consistent with loose cartilage.  Dr. Thoma and Jones agreed to a fourth arthroscopic surgery, this time to the right ankle, based on this result. (Tr. 401) He located and removed the loose cartilage during surgery on November 1, 2002. (Tr. 399)  Though the last two surgeries occurred after the ALJ

hearing, the records pertaining to these surgeries were available to ALJ Bernstein prior to his written decision.

On August 13, 2002, ALJ Bernstein conducted a hearing at which Jones, her husband Donald Jones, and Vocational Expert ("VE") Edward Pagella testified. (Tr. 411)  Jones testified that the arthroscopic surgeries did not improve her symptoms at all and that she continued to fall and sprain her ankles when her knee locked. (Tr. 427-28) She further testified that she would fall climbing the five steps to her house. (Tr. 443) She described difficulty with repetitious work because of tendinitis in her shoulders and an inability to sit for long periods of time. (Tr. 435) Writing caused her hands to cramp up, and driving caused her right knee to lock. (Tr. 444-45)  She said that her husband did most of the housework including vacuuming, sweeping, mopping, and cooking because she had difficulty lifting pans and because her left foot would swell from standing. (Tr. 436) Jones would fix microwave meals, a sandwich, or cereal herself, but she would not sit at the kitchen table to eat because the wooden chair bothered her. (Tr. 438-39)  When Jones sat at home, she would rest her leg on the ottoman. (Tr. 446) However, Jones had a hard time getting up after sitting for 30 minutes to an hour. (Tr. 447)  She thought the longest she recently had walked was 40 minutes in the grocery store holding onto the cart. (Tr. 448)

Insofar as her daily activities, Jones testified that she spent her days visiting with her mother and sister who lived nearby and would come to Jones' house, and that she infrequently

attended church because she it was difficult to climb the 10
stairs into the her church building. (Tr. 436-37) She stated that
Dr. Perry took her off Dr. Thoma's prescription for Celebrex
because it did not help her arthritis, and that she regularly
took Zyrtec for sinusitis and allergies, Zoloft for depression,
Premarin, Zyrtec for her stomach, and Bextra, which Dr. Perry
just had prescribed, for the arthritis. (Tr. 430, 433-34, 439,
444-45) The Zoloft and Zyrtec made Jones tired, and the Zoloft
also dried her throat. (Tr. 444)

Donald also testified that when the family took a vacation
in Florida that year, Jones sat with her leg on the seat beside
hers on the plane and that he rented a wheelchair for Jones to
get around. (Tr. 456) He could not recall Jones ever walking for
an hour and said that she would sit out in the car if her leg
started to bother her while they were grocery shopping. (Tr. 457)
He agreed that when Jones sat at home, she constantly elevated
her leg at least one and one-half feet by resting it on the
ottoman. (Tr. 457)

Following Jones' testimony, ALJ Bernstein asked VE Pagella
what work an individual could perform who could not do "pro-
longed" walking, lift and carry more than 15 pounds occasionally
and five pounds frequently, must elevate her leg six to eight
inches when sitting, and could not do repetitive manipulation
with the right hand.  In response to this hypothetical, the VE
said that there would be an erosion of 80% of all occupations at
the light level and 50% erosion at the sedentary level. (Tr. 449-

16

50)  Although the VE started to testify as to the precise number of jobs available in light of this erosion, ALJ Bernstein sought only the total number of jobs in unskilled sedentary and light, regardless of erosion.  Consequently, VE Pagella testified only that the total number of jobs without erosion was 14,907 sedentary and 74,648 light. In response to a second hypothetical for the same limitations plus a sit/stand option, VE Pagella stated that the erosion would increase to 75% at the sedentary level and 90% at the light level. (Tr. 452) On cross-examination, the VE stated that Jones could perform no work if she had to raise her leg two feet or higher when sitting. (Tr. 453)

In his December 5, 2002 decision denying benefits, ALJ Bernstein determined that Jones was not performing substantially gainful work, had severe impairments, but did not meet any Listings. (Tr. 17-18) In determining Jones' RFC at Step Four, the ALJ found that Jones' testimony regarding her impairments was fully reliable, and that the record supported findings that she experienced severe limitations and pain in her ankle, knees and shoulder, could not lift and carry more than 15 pounds occasionally and five pounds frequently, and could not do repetitive manipulation with her right arm. However, he  found that Jones "admitted" she could do "light work activities including shopping and light cooking" and that she could drive and was functional at home. (Tr. 18, 19)  He further found that there was no evidence to support a need to stand and walk after prolonged sitting.

The ALJ next found that Dr. Thoma's January 2002 estimation of Jones' abilities was not reliable because it was submitted prior to "considerable treatment;" Dr. Thoma reported that Jones could return to work following her last knee surgery; he was not the treating physician for Jones' shoulder; he had not "pursued imaging and other medical involvement with the care of her shoulder"; and thus he based his conclusions upon Jones' own account of her limitations, and appeared to prescribe Celebrex, although Jones denied it. ALJ Bernstein further criticized Dr. Thoma's opinion regarding Jones' capacity to sit as too broad. The ALJ then briefly noted that Dr. Leland performed arthroscopic surgery on Jones' right shoulder, that Zoloft controlled Jones' depression, and that the other symptoms for which she was taking Zyrtec, Prevacid, and Lipitor were not vocationally significant. He also rejected the RFC by DDB physician Lopez as unsupported by the medical record. He never clearly articulated Jones' final RFC beyond the lifting/carrying limitation previously stated. (Tr. 19-20)

At Step Five, ALJ Bernstein concluded that Jones "can perform the requirements of light work." He then applied the erosion levels consistent with the first hypothetical he posed to VE Pagella, but he did not specify the actual number of jobs available after erosion. Rather, he recited the total number of unskilled sedentary and light jobs in Northwest Indiana and con-cluded that Jones could perform work in "significant numbers in the national economy." (Tr.22)

18

Following the ALJ's decision, Dr. Thoma wrote a letter on April 21, 2004 to clarify that his postoperative instruction following Jones' knee surgery did <u>not</u> release Jones to work or indicate a date to return to work, as indicated by the ALJ. He stated that he treated Jones for both her knees, both shoulders, and her ankle and provided pre and post-surgical care for all areas. He further stated:

> Included in the patient's current symptomato-
> logy are the on-going necessity to elevate
> both legs for recurrent swelling.  Typically,
> she needs to elevate the legs several times
> daily to at least the hip level.  These symp-
> toms began during the postoperative course of
> treatment in 2001.  In addition, the patient
> must limit her sitting because of lower ex-
> tremity symptoms. She must limit her sitting
> to less than 30 minutes at any given time.

(Tr. 407)

Dr. Thoma concluded that in his medical opinion, Jones' symptoms precluded her from working eight hours per day, five days a week. (Tr.408).

<u>Discussion</u>

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Secu-rity Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. ß405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); ***Schmidt v. Barnhart***, 395 F.3d 737, 744 (7th Cir. 2005); ***Lopez ex***

19

*rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852, (1972)(*quoting* *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)).  *See also* *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJís decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law.  *Rice v. Barnhart*, 384 F.3d 363, 368-369 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act   The claimant must show that she is unable

> to engage in any substantial gainful activity
> by reason of any medically determinable phys-
> ical or mental impairment which can be ex-
> pected to result in death or which has lasted
> or can be expected to last for a continuous
> period of not less than 12 months.
>
> 42 U.S.C. ß423(d)(1)(A)

The Social Security regulations enumerate the five-step sequen-
tial evaluation to be followed when determining whether a claim-
ant has met the burden of establishing disability.  20 C.F.R.
ß404.1520.  The ALJ first considers whether the claimant is
presently employed or "engaged in substantial gainful activity."
20 C.F.R. ß404.1520(b).  If she is, the claimant is not disabled
and the evaluation process is over; if she is not, the ALJ next
addresses whether the claimant has a severe impairment or combi-
nation of impairments which "significantly limits . . . physical
or mental ability to do basic work activities."  20 C.F.R.
ß404.1520(c).  Third, the ALJ determines whether that severe
impairment meets any of the impairments listed in the regula-
tions.  20 C.F.R. ß401, pt. 404, subpt. P, app. 1.  If it does,
then the impairment is acknowledged by the Commissioner to be
conclusively disabling.  However, if the impairment does not so
limit the claimant's remaining capabilities, the ALJ reviews the
claimant's "residual functional capacity" (RFC) and the physical
and mental demands of his past work.  If, at this fourth step,
the claimant can perform her past relevant work, she will be
found not disabled.  20 C.F.R. ß404.1520(e).  However, if the
claimant shows that her impairment is so severe that she is
unable to engage in her past relevant work, then the burden of

21

proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy.  42 U.S.C. ß423(d)(2); 20 C.F.R. ß404.1520(f).

Jones first argues that this court must remand her case in order to consider Dr. Thoma's April 2004 letter under sentence six of 42 U.S.C. ß405(g). A district court may order the final decision of the Social Security Commissioner remanded under sentence six if "there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  42 U.S.C. ß405(g); *Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th Cir. 1989); *Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir. 1989); *Sears v. Bowen*, 840 F.2d 394, 399 (7th Cir. 1988).  The additional evidence is re-viewed by the court only for the purpose of determining if a remand is necessary and is ignored when considering if the ALJís decision is supported by substantial evidence. *Eads v. Secretary of The Department of Health and Human Services*, 983 F.2d 815, 817 (7th Cir. 1993).  Evidence is considered new if it was "not in existence or available to the claimant at the time of the admin-istrative proceeding." *Sample v. Shalala*, 999 F.2d 1138, 1144

(7th Cir. 1993)(internal citations omitted). *See also **Perkins v. Chater***, 107 F.3d 1290, 1296 (7th Cir. 1997).  However, new con-clusions by doctors or other experts made on the basis of evi-dence already available in the record are not considered "new" for the purposes of a sentence six remand. ***Jens***, 347 F.3d at 214. *See **Perkins***, 107 F.3d at 1296; ***Sample***, 999 F.2d at 1144.

The party seeking remand also must have a good reason for not presenting the evidence during the administrative proceed-ings.  While the exact definition of "good cause" in this context is somewhat elusive, it is clear that new evidence that was not in existence until after the close of administrative proceedings meets the standard of "good cause."  *See **Sears***, 840 F.2d at 399 ("We believe Sears has demonstrated good cause . . . The report itself did not exist until after the Appeals Council had denied his claim."); ***Godsey v. Bowen***, 832 F.2d 443, 444 (7th Cir. 1987) ("Contrary to the governmentís submission, the requirement of good cause for a belated submission was satisfied; evidence of deterioration after the hearing could not have been submitted at the hearing."); ***Watkins v. Chater***, No. 93 C 4603, 1995 WL 493460, at *8 (N.D. Ill. Aug. 16, 1995) ("The fact that the operation took place two years later would provide Plaintiff with good cause for not introducing evidence of the operation during the

administrative hearing").  The requirement that good cause be shown "reflects a congressional determination to prevent the bad faith manipulation of the administrative process." ***Milano v. Bowen***, 809 F.2d 763, 767 (11th Cir. 1987).

The final requirement, materiality, means that "there is a reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered." ***Perkins***, 107 F.3d at 1296.  *See also* ***Schmidt***, 395 F.3d at 742; ***Sears***, 840 F.2d at 400.  In the Seventh Circuit, "medical records postdating the hearing and that speak only to the applicantís current condition, not to his condition at the time his application was under consideration by the Social Security Administration, do not meet the standard for new and material evidence." ***Schmidt***, 395 F.3d at 742 (internal quotes omitted) (*citing* ***Kapusta***, 900 F.2d at 97).  *See also* ***Anderson***, 868 F.2d at 927 ("Remand for consid-eration of additional evidence is appropriate only upon a showing that the evidence is new and material to the claimantís condition during the relevant time period encompassed by the disability application under review."); ***Godsey***, 832 F.2d at 445 ("The fact that her condition had deteriorated by 1986 does not show that in 1983 it was otherwise than found at the administrative hearing").

The parties do not dispute that Dr. Thoma's April 2004 report is new, but rather that it is material and that the plaintiff has good cause for failing to produce it.  With respect to good cause, preventing the addition of the 2004 report would perpetuate a blatant manipulation of the administrative process. The record on which ALJ Bernstein relied to conclude that Jones was released to work actually is a pre-formatted 1-page Physician's Orders form on which Dr. Thoma only wrote that Jones should take Vicodin for pain and follow up with him in 2 weeks. The "Return to Work/School" section merely has a line next to it. At best, this line is ambiguous.  Even if construed as some sort of indication Jones could return to work, it does not provide a date certain.  By declining to recontact Dr. Thoma to clarify this ambiguity before discounting Dr. Thoma's opinion because of it, ALJ Bernstein failed to fulfill one of his most basic obligations under the Social Security Regulations: to "solicit additional information to flesh out an opinion for which the medical support is not readily discernable." *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004).  *See also* *Skarbek v. Barnhart*, 105 Fed. Appx. 836, 839 (7th Cir. 2004).  *See also* 20 C.F.R. ß 404.1512(e). The 2004 report seeks to correct this failure and should be permitted for that purpose.  It makes no sense to say

that the plaintiff lacks good cause, as the Commissioner argues, for the untimely submission of this report simply because she did not anticipate that the ALJ would construe a dotted line as an indication she could work.

The 2004 report also is material.  The Commissioner's argument that the 2004 report could not establish a basis for changing the ALJ's decision must fail in light of the ALJ's specific reliance on a misinterpretation of Dr. Thoma's work release opinion.  The Commissioner's second argument, that some of the symptoms described in the 2004 report may post-date the relevant time period, only has partial merit. Dr. Thoma's state-ment that the swelling and need to elevate Jones' legs began after her 2001 surgery indicates that these symptoms pre-dated the ALJ hearing and decision by well over one year.  In fact, the medical record has multiple references to visible warmth and swelling in Jones feet, ankles, and legs. (Tr. 293-94, 316, 318) The ALJ will have the opportunity to clarify the extent to which the other symptoms described by Dr. Thoma may have evolved after the ALJ's decision on remand.

Next, Jones argues that the ALJ improperly discounted Dr. Thoma's opinion.  A treating sourceís opinions are entitled to controlling weight if the "opinion on the issue(s) of the nature

26

and severity of [the claimantís] impairment(s) is well-supported
by medically acceptable clinical and laboratory diagnostic
techniques and is not inconsistent with the other substantial
evidence" in the record. 20 C.F.R. ß404.1527(d)(2), 20 C.F.R.
ß416.927(d)(2).  *See also* ***Gudgell v. Barnhart***, 345 F.3d 467, 470
(7th Cir. 2003).  The ALJ must "minimally articulate his reasons
for crediting or rejecting evidence of disability." ***Clifford v.
Apfel***, 227 F.3d 863, 870 (7th Cir. 2000) (*quoting* ***Scivally v.
Sullivan***, 966 F.2d 1070, 1076 (7th Cir. 1992)).  *See also* 20
C.F.R. ß404.1527(d)(2), 20 C.F.R. ß416.927(d)(2) ("We will always
give good reasons in our notice of determination or decision for
the weight we give your treating sourceís opinion.").  As ad-
dressed above, the ALJ has a duty to solicit additional informa-
tion from the treating physician prior to rejecting that opinion
on the grounds that it lacks backup support. ***Barnett***, 381 F.3d at
669 (7th Cir. 2004).  *See also* ***Smith v. Apfel***, 231 F.3d 433, 437-
38 (7th Cir. 2000).

     Here, the ALJ's reasons for why Dr. Thoma's January 2002
report is only partially credible simply have no rational founda-
tion in the record.  First, Dr. Thoma's estimation hardly was
prior to "considerable treatment," as the ALJ suggests. Rather,
this report was a bare eight months before the ALJ hearing and

preceded only two of Jones' four surgeries, both of which oc-
curred following the hearing.  More importantly, the ALJ made no
effort to determine whether this report is consistent with the
other medical evidence of record, both before and after those
later surgeries, and no inconsistency is apparent to the court.
Next, ALJ Bernstein's claim that Dr. Thoma was not treating Jones
for her shoulder pain is false.  Dr. Leland, who works in the
same office as Dr. Thoma and whose records were produced in the
same file as Dr. Thoma's,  treated Jones' right shoulder.
However, Dr. Thoma was Jones' primary orthopedic physician for at
least 9 years, treated Jones' left shoulder (which the ALJ
entirely ignores in his opinion), ordered an MRI for that area,
gave her a steroid shot, and monitored her physical therapy
progress.  In any event, it cannot be said that Dr. Thoma's
report is not credible regarding Jones' right shoulder pain when
no effort has been made to determine whether his report actually
is inconsistent with the evidence on record. The ALJ's third
reason for discounting Dr. Thoma's opinion, the alleged "return
to work" statement, has been rejected as false above.  It further
defies logic to state, as the ALJ does in his opinion, that Dr.
Thoma is less credible for relying on the plaintiff's testimony
when the ALJ himself found that testimony to be fully credible.

28

Finally, the ALJ's refusal to find Dr. Thoma credible because confusion over Jones' Celebrex prescription is both based on the thinnest of pretexts and unsupported by the record. As the ALJ noted, Dr. Thoma was well aware that Jones suffered from NSAID side-effects and GERD. (Tr. 20)  He prescribed Celebrex, which was consistent with these limitations, but Dr. Perry took Jones off the drug  because it was not helping.  (Tr. 336, 430) The portion of the record on which ALJ Bernstein relies to claim that Dr. Thoma re-prescribed Celebrex is an August 6, 2001 post-surgical report that stated that "Celebrex 200 mg daily" was one of Jones' prescriptions.  However, Jones denied that Dr. Thoma prescribed Celebrex again. (Tr. 446) Based on this evidence, Dr. Thoma may not have known that Dr. Perry took Jones off Celebrex, may have entered old information under the medications list in the 2001 report, or in fact may have re-prescribed Celebrex and the error was with Jones.  But with any of these scenarios, the court cannot see how the Celebrex question suggests that Dr. Thoma was out of touch with his patient, as the ALJ opines.  And regardless, ALJ Bernstein had an affirmative duty to seek explanation from Dr. Thoma before construing this ambiguity against the plaintiff.

The only correct criticism ALJ Bernstein makes of the January 2002 report is that Dr. Thoma may have construed Jones' capacity to sit too narrowly.  In the report, Dr. Thoma stated that Jones could sit for up to four hours total or 30 minutes without interruption. (Tr. 360)  ALJ Bernstein criticized this conclusion as not precisely supported by Dr. Thoma's findings, which showed difficulty rising from a seated position rather than simply sitting. (Tr. 20) However, the only other evidence on record regarding Jones' ability to sit was a more limited RFC by a DDB physician, which the ALJ found unsupported, and Jones' testimony, which was both consistent with Dr. Thoma's statements and which the ALJ found credible.  Because the ALJ totally failed to articulate a precise RFC for Jones, including her ability to sit or stand, the court cannot determine whether ALJ Bernstein's analysis on this point is supported by the substantial evidence or even how it relates to Jones' actual RFC.  The court further notes that the incomplete RFC determination is itself a basis for remand. *See* SSR 96-8p, at *5.  *See also* ***Gotz v. Barnhart***, 207 F. Supp.2d 886, 897 (E.D. Wis. 2002) (remanding in part because the ALJ considered only a few of the exertional categories relevant to an RFC determination).

30

Although it is unnecessary to reach the plaintiff's other arguments in support of remand, the court briefly notes that the ALJ misconstrued the plaintiff's testimony when reaching her RFC. A claimant does not need to be totally incapacitated and asocial in order to be eligible for benefits. *See **Carradine v. Barnhart***, 360 F.3d 751, 755-56 (7th Cir. 2004); ***Clifford***, 227 F.3d at 872-73. Furthermore, an ALJ may not merely list a claimantís daily activities "as substantial evidence that [he] does not suffer disabling pain . . . because minimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity." ***Clifford***, 227 F.3d at 872. *See also **Carradine***, 360 F.3d at 755 (finding that the ALJ erred when he "failed to consider the difference between a personís being able to engage in sporadic physical activities and [him] being able to work eight hours a day five consecutive days of the week.").

Here, ALJ Bernstein stated that Jones "admitted she can do light work activities including shopping and light cooking." However, the uncontroverted evidence is that Jones went shopping with her husband, that her husband did all the lifting involved with shopping, that Jones used the cart for support, and that she sometimes had to rest in the car because she could not be on her feet long enough to complete the task. As for cooking, the

evidence was that Jones could fix essentially pre-cooked food or food that did not require preparation but that her husband cooked the other meals. It was improper to omit all references to her husband's assistance in these activities, or the pain she experienced doing them, to conclude Jones "can do light work" on her own.

Overall, the court expresses concern over the result-oriented approach the ALJ seems to have taken in this case. *See Jones v. Heckler*, 583 F. Supp. 1250, 1253 (N.D. Ill. 1984). On remand, the ALJ shall recontact Dr. Thoma to clarify perceived ambiguities in his records before construing them against the plaintiff, fairly support his conclusions with evidence of record, and present a more complete explanation of Jones' RFC and resulting abilities.

————————————

For the foregoing reasons, the Motion for Summary Judgment filed by the plaintiff, Brenda Jones, on June 2, 2005 is **GRANTED**, and the Motion for Remand filed by Jones on July 27, 2005 is **GRANTED**.

ENTERED this 31st day of January, 2006

     s/ ANDREW P. RODOVICH
      United States Magistrate Judge